UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| PEGGI CALDERARO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:13-CV-385 JD |
| | ) |
| TOWN OF SCHERERVILLE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPINION AND ORDER

In this case Plaintiff Peggi Calderaro brings Title VII gender discrimination and
retaliation claims against the Town of Schererville, the Schererville Police Department (the
Department) and several officers of the Department. Discovery has now closed and the
Defendants have filed a motion for summary judgment which is ripe for review.

## STANDARD OF REVIEW

Summary judgment is appropriate when there "is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine
dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir.
2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). To survive a motion
for summary judgment, the party with the burden of proof "must affirmatively demonstrate, by
specific factual allegations, that there is a genuine issue of material fact that requires trial."
*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

# FACTS

For the purposes of this motion for summary judgment, the Court will construe the evidence in the light most favorable to Calderaro. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Peggi Calderaro began working for the Town of Schererville as a part-time emergency dispatcher in 1985. She then became a police officer in 1990, beginning as a patrol officer and earning the rank of first class patrol officer a year later. In 1999, she earned another promotion, this time to the rank of corporal.

In 2000, then-Deputy-Chief David Dowling (one of the individual defendants) recommended that Calderaro be transferred from the patrol division to the Criminal Investigations Unit and she was reassigned accordingly. Dowling became the Chief of Police in 2005. He served in that role until 2008, when Daniel Smith assumed it.

Smith then appointed Calderaro Commander of the Criminal Investigations Unit. That appointment did not change Calderaro's merit rank of corporal, but it did increase her base salary by about $6,000 per year. Calderaro also became Dowling and Officer Dennis Zagrocki's (another individual defendant) superior officer.

Calderaro remained in the Criminal Investigations Unit through January 2012, when Dowling was reappointed as chief. Dowling then decided to fill command staff positions through a merit-based selection process that included applications and interviews. This differed from prior practice in the Department, under which chiefs had simply appointed their preferred candidates. Calderaro interviewed for Commander of the Criminal Investigations Unit, but Dowling gave the position to Officer Michael Vode (also a defendant in this case). Vode had approximately five years of detective experience and eighteen years of police experience. He

had also been a sergeant in the Marine Corps. Dowling explained that he selected Vode for his leadership skills. Calderaro was subsequently reassigned to the patrol division, maintaining her rank as corporal.

In 2009 Sergeant Vandenburgh retired. No one was awarded the rank of sergeant at that time. In May and June 2012, Police Consultants, Inc. administered examinations for the ranks of corporal and sergeant at the request of the Schererville Police Department. That exam contained both written and oral segments. Calderaro sat for it, obtaining the highest score out of seven officers on the written component and scoring fifth on the oral component. Vode also sat for it, scoring seventh on the written component and sixth on the oral component. Two officers were promoted to corporal in July 2012. None were promoted to sergeant.

A short time earlier, March 30, 2012, Calderaro and Smith had seen pictures of alcohol, a minority woman, an alien and what appeared to be an erect penis (though was actually a geoduck, a type of phallic-shaped mollusk) on Vode's interior door and window. Calderaro submitted a written complaint to Sergeant Larry Mysliwiec, which described the pictures as "shocking, disturbing [and] offensive to women, minorities and employees in general." [DE 53-19]. Smith also reported the images, though did so to Zagrocki, who immediately removed them. Zagrocki also reported the matter to Dowling, who assigned him to conduct a preliminary investigation. Zagrocki required Vode to provide a description of the pictures and the reason they were displayed. Vode responded, among other things, that the pictures had been created by several detectives as a joke. Zagrocki then told Vode to instruct the detectives that the display of inappropriate pictures would not be tolerated and considered the matter resolved.

Throughout 2012, Calderaro received four Guardian Tracking entries. Guardian Tracking is a personnel documentation system. While it is often used to document violations of

departmental policy and informal disciplinary interactions, a Guardian Tracking entry is not a formal reprimand. [DE 53-4 at 3-4]. An officer's Guardian Tracking entries carry no direct disciplinary consequences, though may be examined by superiors to determine how often the officer has had disciplinary issues and in determining whether to formally reprimand an officer. *See* [DE 53-4 at 3-4]; [DE 47-5 at 6-7].

Calderaro first received a Guardian Tracking entry from Officer Brian Neyhart (the last of the individual defendants) on March 2, 2012 for authorizing the continued pursuit of a non-forcibly stolen vehicle. Second, on March 10, 2012, she received a Guardian Tracking entry from Neyhart for violating the department's harassment and fraternization policy. This stemmed from an incident in which Calderaro walked by a piece of paper posted on the Department's patch board with "Furman Police Dept. R.O.T.C. Dress Left Run Right" written on it, but failed to remove it. [DE 53-16 at 2]. Two others received entries as a result of this incident, Sergeant Diane Pfeifer, who like Calderaro failed to remove the posting, and Officer Hiland Weaver, who made the posting. Third, on July 2, 2012, Calderaro received a Guardian Tracking entry from Neyhart for violating an attendance policy which prohibited officers from exceeding the departmental leave average by more than twenty percent. Calderaro had taken two sick days out of the more than one hundred she had accumulated. Neyhart had previously issued Guardian Tracking entries to both men and women for violating this policy. Calderaro received a fourth Guardian Tracking entry on September 7, 2012 from Mysliweic for calling detectives to the scene of a fire without first consulting fire department investigators. While Neyhart had implemented policy revisions in response to concerns voiced by the Schererville Fire Chief that required, among other things, police supervisors to consult with fire investigators prior to calling

detectives, those revisions were not in place at the time of the conduct that prompted Calderaro's September 7, 2012 Guardian Tracking entry.

Calderaro also underwent an internal investigation beginning in July 2012. That investigation pertained to Calderaro's response to an officer's use of force that occurred under her supervision. The investigation sought to determine whether she violated department policy by altering a police report, failing to fill out a Worker's Compensation Form for an officer that suffered a minor injury and violating her supervisory responsibilities. All three violations were determined to be either unfounded or not sustained.

In the fall of 2013, Calderaro was removed as instructor for the Department's women's self-defense class, which she had started several years prior.

On September 18, 2012, Calderaro filed a charge of discrimination against the Defendants with the Equal Employment Opportunity Commission. On July 29, 2013, the EEOC responded with a notice of right to sue. Calderaro subsequently filed another charge against the Defendants asserting retaliation on June 6, 2013. The EEOC responded with a second notice of right to sue on September 12, 2014. Calderaro filed this suit on October 25, 2013.

**ANALYSIS**

1. Motion to Strike

Prior to addressing the Defendants' motion for summary judgment, it is necessary to resolve their motion to strike [DE 59]. That motion presents a "threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The decision to grant or deny a motion to strike is within the discretion of the trial court. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).

The Defendants argue that the appendix to Calderaro's response impermissibly contains

unsupported and misleading factual statements, couches argument as fact and exceeds the length requirements of this Court's prior order [DE 49] and Local Rule 7-1.  As a result, they request that the Court strike the appendix [DE 53] in its entirety.  In response, the Plaintiff argues that her factual statements are properly supported and that her brief complies with this Court's page limits, which do not explicitly forbid the filing of a separate appendix.

The Court denies the motion to strike.  The Court finds it preferable to address the Plaintiff's oversized briefing rather than strike the Plaintiff's appendix and process "a series of reiterated and substitute [filings]."  *U.S. ex rel. Madej v. Schomig*, 223 F. Supp. 2d 968, 970 (N.D. Ill. 2002).  Further, that decision does not prejudice the Defendants, since the Plaintiff's appendix covers much of the same territory as her response brief and the Defendants have already submitted their reply brief.  Finally, and perhaps most importantly, the Court notes the Defendants' argument that numerous statements in the Plaintiff's appendix are misleading, not adequately supported or are arguments masquerading as facts.  However, the Court is capable of disregarding any unsupported or misleading assertions of counsel and relies on evidence only after confirming its designation in the record.  *J.H. v. Sch. Town of Munster*, No. 2:12-CV-69 PS, 2016 WL 427351, at *12 (N.D. Ind. Feb. 3, 2016) ("I don't rely on evidence without confirming its precise designation in the record.  Because I'm able to parse out what to rely on and what to ignore, I don't see any reason to strike J.H.'s filing."); *Minix v. Pazera*, No. 3:06-CV-398 JVB, 2010 WL 3185819, at *5 (N.D. Ind. Aug. 9, 2010).  As such, the Court denies the Defendants' motion to strike.

## 2.  Improper Defendants

The defense also seeks the dismissal of all Defendants other than the Town of Schererville.  It says that Calderaro's claims against the individual defendants must be dismissed

since Title VII does not impose individual liability. Further, it argues that claims against the individual defendants in their official capacities are redundant since the Town of Schererville is already named as a defendant. It also believes that the Schererville Police Department should be dismissed because it is not a suable entity under Indiana law. Calderaro does not respond to these arguments.

The defense is correct. It is well-established in this circuit that Title VII claims are not viable against individuals. *See, e.g., Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) (holding that a supervisor acting in his individual capacity does not fall within Title VII's definition of employer). Moreover, a claim against a person's office is no different from a claim against the entity and is properly dismissed as duplicative. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 771 (7th Cir. 2006). Finally, whether the Schererville Police Department is a defendant in this action in addition to the Town of Schererville "is a dispute without a substantive effect on this lawsuit" since naming the police department is functionally the same as suing the Town of Schererville itself. *Riley v. Bd. of Comm'rs of Tippecanoe Cty.*, No. 4:14-CV-63-JD-PRC, 2015 WL 3605558, at *3 (N.D. Ind. Jan. 7, 2015); *see also* Ind. Code § 36-4-9-8(b)(4) (providing that the city executive appoints the police chief). Nevertheless, it is preferable to dismiss the Schererville Police Department in the interest of clarity. So, consistent with the above analysis, the Court dismisses all defendants other than the Town of Schererville.

### 3. Direct Discrimination Claim

Preliminaries aside, the Court turns to the merits of Calderaro's claims. She first alleges that the Defendants discriminated against her because of her gender in violation of Title VII. Such a claim can be established via either a direct or an indirect method of proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). She seeks to employ both. The Court begins

with analyzing her claim under the direct method.

Calderaro claims that she suffered direct discrimination in three ways. First, she says that Dowling appointed Vode instead of her as Commander in January 2012. Second, she contends that Dowling elected not to fill an open sergeant's position in June 2012 to avoid promoting her out of discriminatory animus. Third, she claims that she received Guardian Tracking entries and was subjected to an internal investigation, while her male colleagues engaged in conduct similar to hers without those consequences. As will be demonstrated below, however, Calderaro has not presented evidence that gives rise to a reasonable inference that any of these actions were motivated by discriminatory animus. Furthermore, she has not established that she suffered an adverse employment action in connection with the latter two claims, which provides an independent reason for rejecting them.

*Evidence of Discriminatory Animus*

"To avoid summary judgment using the 'direct method,' a plaintiff must marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus." *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012). Direct evidence is rare, usually amounting to an admission of animus by the decisionmaker. *Id.* But a plaintiff can also make out a direct discrimination claim with a "convincing mosaic" of circumstantial evidence. *Coleman*, 667 F.3d at 860. That can include: (1) "suspicious timing, ambiguous statements oral or written, ... and other bits and pieces from which an inference of [discriminatory] intent might be drawn", (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently" and (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* Calderaro points to a variety of evidence in an attempt to establish such a mosaic.

*Failure to Appoint to Commander*

With regard to her failure to appoint to Commander allegation, Calderaro argues that Chief Dowling's assertion that he appointed Vode to command on account of his leadership abilities was pretextual, since she is an objectively better leader.[1] The Defendants respond that Dowling's decision to appoint Vode instead of Calderaro was an honest choice that resulted from an impartial application and interview process.

The Court agrees with the Defendants that a finding of pretext is not justified. "[W]hen a plaintiff seeks to prevent summary judgment based on the strength of a discrepancy in qualifications, [her] qualifications must be so superior to the selected candidate's qualifications that a reasonable, impartial person could determine that the plaintiff was clearly better qualified for the position. A plaintiff cannot show pretext merely by demonstrating that the defendant improperly evaluated his credentials, so long as the defendant honestly believed the evaluation." *Karim v. Bd. of Trustees of W. Illinois Univ.*, 52 F. App'x 855, 858 (7th Cir. 2002) (citing *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002)).

To show pretext, Calderaro relies primarily on the results of a May and June 2012 sergeant's test, administered several months after Vode's promotion to Comander.[2] That exam had both written and oral components. Calderaro handily outscored Vode on the written section, though in interviews assessors judged Vode and Calderaro to have relatively comparable

---

[1] Calderaro also contends that "inconsistencies exist regarding the criteria employed by Defendant Dowling regarding the Commander position", though she fails to provide evidence to support that proposition. [DE 53 at 9]. Rather, it appears that Dowling was quite consistent in emphasizing the importance of leadership in his decision. *See, e.g.*, [DE 53-2 at 19] (Vode "provided the best leadership and was most qualified"); [DE 53-2 at 15] ("I wanted the most qualified people in those positions that had the ability to lead").

[2] Calderaro also offers her own assessment that she was markedly more qualified than Vode, but the Seventh Circuit has "repeatedly held that this is not enough to create a genuine dispute of fact to avoid summary judgment." *Yost v. Chicago Park Dist.*, 17 F. Supp. 3d 803, 814 (N.D. Ill. 2014) (collecting cases).

leadership skills (both received ratings of "qualified" with Vode receiving 11 points for leadership and Calderaro 12; the maximum number of points available is unclear). [DE 53-8 at 6-7, 67, 71]. Those test scores are not, however, sufficient to demonstrate that Dowling's estimation of Vode as a superior leader to her was dishonest. Indeed, Dowling would not have had access to them when he made his Commander determination in January 2012.[3] Nor has Calderaro presented any other evidence to indicate that Dowling would have had prior knowledge of the capabilities she possessed which allowed her to perform well on the sergeant's exam. And even if she had, academic leadership acumen does necessarily account for other attributes indicative of leadership ability, such as Vode's Marine Corps experience. [DE 47-4 at 4-5].

In her statement of facts, Calderaro also contends that Dowling's justification for choosing Vode over Calderaro was pretextual because Vode had more Guardian Tracking entries than she did and Dowling elected not to appoint Vode to command staff in 2001. To the extent Calderaro considers these factors indicative of pretext, she should have raised them in her response. *See Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 852 (7th Cir. 2015). But even if Calderaro had properly raised these points, she fails to adequately develop them. As to the Guardian Tracking entries, Calderaro appears to allege that these rendered Vode unfit for command. But she fails to present evidence that they were so egregious that they would have precluded any reasonable police chief from appointing him to that position. Nor does she otherwise explain how they could show that Dowling's rationale for appointing Vode—that he

---

[3] Calderaro argues that the test results are nevertheless relevant because they represent Dowling's personal opinion. That is not persuasive. While Dowling sat on the board that rated applicants in the oral portion of the exam, the Plaintiff presents no evidence that the board's average assessment of Vode and Calderaro was representative of Dowling's own assessment. Moreover, the board only rated applicants on the oral portion of the exam, on which Calderaro and Dowling received relatively comparable leadership scores. [DE 53-2 at 7].

had a superior capacity for leadership—was a lie. Whether they potentially show that selecting

Vode was ill-conceived, that is not the focus of the pretext inquiry. *Stewart v. Henderson*, 207

F.3d 374, 378 (7th Cir. 2000) (the "focus of a pretext inquiry is whether the employer's stated

reason was honest, not whether it was accurate, wise, or well-considered."). As to Dowling's

purported decision not to appoint Vode to command in 2001, Calderaro offers no evidence that

Dowling had any influence over that decision. And she cannot rely on speculation to

"manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir.

2008). Even if Dowling had rejected Vode for command in 2001, that was over a decade before

the events at issue here and would thus seem to be of little relevance. So, Calderaro has not

presented evidence suggestive of pretext.[4] Rather, it seems that she "wants to put to a jury the

question whether [the Department] would have been better served with [her] services rather than

[Vode's], but Title VII is some distance from the sort of just-cause rule that labor arbitrators

apply." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684-85 (7th Cir. 2000).

     Calderaro also attempts to derive evidence of discriminatory animus from Dowling's

statements that corporals are not fit to be Commanders. [DE 53-1 at 28] ("She's a corporal. She

doesn't deserve that position."); [DE 53-4 at 9] (Dowling inquired whether Smith "had a

problem with him as a lieutenant reporting to a corporal.").[5] These comments followed Smith's

---

[4] Calderaro also alleges that neither Dowling nor Zagrocki "pressed [her] as to her leadership capabilities," [DE 52 at 16], but the deposition testimony she cites to does not directly support that proposition. [DE 53-1 at 23] ("Q: What were the concerns that the deputy chief raised during that interview? Two that I talked meanly to him one time when he was cleaning an air filter; that was an issue for him. And also that, uhm, we had one girl who was a heroin user, and why – She's trying to clean herself up. Why I had assigned Jeff Cook to speak with her. She wanted to go to school to be a police officer one day."); [DE 53-1 at 24] (A: Chief Dowling had concerns the way – regarding the clearance codes. How we were codifying reports.") Even if it did, it is unclear how it would be relevant that Calderaro's interviewers did not make their criteria clear to her without evidence that they did so for other candidates.

[5] The Defendants argue that the Plaintiff's contention that Dowling "publicly expressed his contention that commanders cannot be corporals" is based on hearsay. [DE 64 at 21-22]. But they do not attach the page of Calderaro's deposition that they cite for that proposition, "Pl. Dep. at 46:2-3." *Id*. Regardless, whether or not this statement is hearsay, it is not probative of discrimination for the reasons discussed above.

2008 replacement of Dowling as chief.  Smith then appointed Calderaro to Commander, which made Dowling, superior in rank, Calderaro's subordinate.  Calderaro says Dowling's decision to promote two corporals to command in 2012 casts suspicion on his 2008 assertion that corporals cannot be Commanders, thus inferring some other reason for his opposition to Calderaro's promotion to Commander.  The Defense responds, among other things, that the statements are too old to be probative.

Assuming that Dowling was disingenuous when he said that corporals cannot be Commanders following Calderaro's appointment to command in 2008, it is quite an inferential leap to presume that was due to discriminatory animus rather than a general dislike for Calderaro or sour grapes over his removal as chief.  But even if those statements were misogynistic, they are only evidence of direct discrimination if they were made around the time of an adverse employment action and in reference to it.  *Garcia v. U.S. Postal Serv.*, 414 F. App'x 855, 857 (7th Cir. 2011).  Calderaro has presented no evidence to connect Dowling's statement to an adverse employment action.  And even if she had, Dowling's statement preceded the adverse employment actions Calderaro alleges by about four years, which is far too long to give rise to an inference of discrimination.  *See, e.g., Hemsworth*, 476 F.3d at 489, 491 (comment that age discrimination plaintiff looked "old and tired" made a year before his termination too dated to warrant consideration as direct evidence of discrimination); *Karim*, 52 F. App'x at 858 (finding that asking a Bangladeshi man about his involvement in the World Trade Center and Oklahoma City bombings several years before adverse employment action at issue was too temporally remote to be probative of national origin discrimination).  As such, Dowling's statements amount at most to "stray remarks", which are insufficient to establish prohibited animus.  *See Hemsworth*, 476 F.3d at 491.

Lastly, Calderaro alleges that Dowling and Zagrocki displayed discriminatory animus in referring to her old desk as "the bitch desk" in August 2008. [DE 47-1 at 37]. Prior to her appointment as Criminal Investigations Unit Commander, Calderaro had sat at a desk located in the Commander's office and typically occupied by one of the Commander's subordinates. *Id*. But like the above, Dowling's comment predates the adverse employment actions Calderaro alleges by nearly four years and thus is too distant to be probative. *See Karim*, 52 F. App'x at 858. Furthermore, Calderaro testified that this comment referred to the desk's position in the office, occupied by one in an inferior position. [DE 53-1 at 28]. As such, even if Dowling's comment had been made more recently, it would not support an inference of discrimination since Calderaro herself suggests it was not a reference towards her personally, or women in general, but the subordinate position assigned to the desk and once occupied by Dowling and Zagrocki. As such, Calderaro has failed to present evidence that could give rise to an inference of gender-based discrimination in connection with Dowling's failure to promote her to Commander in January 2012.

*Failure to Promote to Sergeant*

Calderaro likewise fails to offer any viable evidence of discrimination in connection with Dowling's failure to promote her to sergeant in June 2012. She first argues that the Department would not have incurred the expense of administering a sergeant's exam had a position not been open. But if that were true, it would at most establish that a position was open, not that Calderaro was not promoted out of discriminatory animus.[6] To the extent that Calderaro argues that she was clearly more qualified than any other candidate, thus raising an inference that Dowling's decision not to promote any officer to sergeant must have been out of animus towards

---

[6] And as discussed below, the Court disagrees that Calderaro's evidence is sufficient to support the reasonable inference that the Department had an open sergeant's position in 2012.

her, the argument fails for two reasons.  First, Calderaro has not presented evidence that she was so qualified as to leave Dowling with a lack of other reasonable candidates for promotion.  While she emphasizes that she received the highest score on her written exam, she does not account for her comparatively poor performance on the oral exam.  [DE 53 at 32]; [DE 53-8 at 7].  Other candidates did relatively well on both sections of the exam, such as Neyhart, who scored third on the written exam and second on the oral exam.  [DE 53-8 at 6-7].  Second, even if Calderaro were indisputably the only viable candidate for promotion and Dowling did not promote her because he disliked her, Calderaro has still offered no indication of *gender-based* animus.  *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 462 (7th Cir. 2014) ("Each and every one of these issues could arise just as easily if Roberts simply did not like Widmar's personality or his style or, for that matter, his cologne.  Title VII does not protect employees from poor managers or unpleasant and unfair employers.").  As such, she has not presented the direct evidence of discrimination necessary to substantiate her claim.

### Guardian Tracking Entries and the Internal Investigation

That leaves Calderaro's claim that she received Guardian Tracking entries and was subjected to an internal investigation.  Calderaro attempts to derive an inference of animus as to these by claiming that males engaged in similar conduct did not experience the same consequences.  As discussed below, the internal investigation and Guardian Tracking entries do not constitute adverse employment actions (a separate reason for rejecting her claim), but could nevertheless be evidence of discriminatory animus.  *See Oest*, 240 F.3d at 613 ("Of course, even if the negative performance evaluations or reprimands cannot, standing alone, state a claim of discrimination, they can constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute.").

So, the Court turns to determining whether there is a disparity in the issuance of Guardian Tracking entries such as might establish discriminatory animus. To draw any inference of discrimination from such a disparity, Calderaro must present evidence of comparators that were similarly situated to her. *See id.* at 614. The similarly situated analysis takes into account a variety of factors including, where relevant, whether the compared employees had the same job descriptions, were subject to the same standards, were subordinate to the same supervisor and had comparable experience, education and other qualifications. *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011). This is not a mechanical or inflexible inquiry, however, and pertinent considerations vary from case to case. *Id*. Ultimately, the question is simply whether the proffered comparators are directly comparable in all material respects. *Id*. Calderaro attempts to point to a comparator for each Guardian Tracking entry she received.

First, she says that she received a March 2, 2012 Guardian Tracking entry for failing to call off a vehicle pursuit relating to a non-forcible felony, but that Corporal Marcus Handley engaged in "nearly identical" conduct a few months later without discipline. [DE 52 at 19]. But the record indicates material discrepancies between these incidents. While Neyhart entered Calderaro's Guardian Tracking entry, Calderaro does not offer evidence to indicate that Neyhart also made the decision to not discipline Handley. Further, Calderaro and Handley engaged in significantly different conduct. Calderaro purportedly authorized a pursuit for a property crime, which is clearly a violation of departmental policy. [DE 53-13]. While she claims she was unaware how the vehicle was stolen, pursuit "when the suspect flees for unknown reasons" is also prohibited. *Id*. In contrast, Handley initiated a car stop following a report of stolen property and, when the vehicle fled, officers from a *different police department* gave chase. [DE 53-33 at 4]. Finally, while Calderaro was serving as a supervisor at the time she received her violation, it

is unclear whether Handley was. As such, Calderaro and Handley were not sufficiently similarly situated to allow for a reasonable inference of discrimination.

Second, Calderaro says that Commander Neyhart issued her and another female officer a March 10, 2012 Guardian Tracking entry for failing to report an offensive note, though did not issue one to a male officer who also saw it.[7] But Neyhart appears to have disciplined the female officers who saw the note because they were supervisors, while the male was not. [DE 53-17 at 2] (“*As Supervisors* I would have expected that one of you would have at least removed it from the board.”) (emphasis added). That undermines any potential comparison between them. *See Abuelyaman*, 667 F.3d at 810-11 (noting that the similarly situated analysis considers whether the comparators “held the same job description” and “were subject to the same standards”). And while Calderaro argues that all employees had a departmental obligation to stop harassment, Neyhart may have legitimately believed that supervisors had a heightened obligation to do so. *See id.* (noting a university’s “common sense” expectation that higher-ranking professors meet elevated standards as compared to lower-ranking professors). Additionally, Neyhart ordered a Guardian Tracking entry against the male officer who wrote the note, further suggesting that he did not act out of gender bias. [DE 53-17 at 3].

Third, Calderaro argues that she received a September 7, 2012 Guardian Tracking entry, while Officer Steve Burton, engaged in more severe conduct but did not. Specifically, Calderaro called detectives upon responding to the scene of a fire, rather than first coordinating with the Schererville Fire Department fire investigators. [DE 53-27]. Neyhart ordered Mysliwiec to

---

[7] Calderaro also attempts to attribute some suspicion to the fact that she was disciplined for this incident, yet some officers who posted offensive pictures on Vode’s door were not. It is not apparent how she believes this comparison to be probative. In both cases, the supervising officers were disciplined. To the extent that subordinate officers were not disciplined in the picture incident, but were in the R.O.T.C. note incident, it is unclear why this would give rise to an inference of gender discrimination or even whether any of the subordinate officers were female.

discuss this incident with Calderaro and document his conversation with a Guardian Tracking entry. In comparison, Burton transported an accident victim to an ambulance in his squad car, rather than arranging for the ambulance to come to the victim. In response to this incident, however, Neyhart instructed Smith to "just talk to [Burton] about it", and there is no indication that Smith documented that conversation with a Guardian Tracking entry. [DE 53-4 at 14].

Any inference that can be drawn from this incident is weak at best. A reasonable juror could conclude that Calderaro's conduct was less severe than Burton's, particularly because it appears that, unlike Burton, Calderaro actually complied with departmental policy; the change in policy that required supervising officers to contact fire command prior to calling detectives did not happen until after the conduct that resulted in Calderaro's Guardian Tracking entry. [DE 53-1 at 42]; [DE 53-28]. But to the extent that Calderaro was treated differently than Burton it does not suggest any illegal animus. Rather, superior officers had conversations with both Burton and Calderaro. While the discussion with Calderaro was also documented, the resulting notation does not appear punitive. [DE 53-27] ("Sgt. Mysliwiec was told to enter a Guardian Tracking to document that he spoke to you about the concerns of the Fire Chief. This entry should have been labeled as Counseling instead of General Performance."). Such a slight difference in treatment is not indicative of disparate treatment based on gender. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, No. 13-CV-0858, 2015 WL 3791458, at *3 (E.D. Wis. June 18, 2015).

Calderaro next says that she received a Guardian Tracking entry on July 2, 2012 for taking two sick days in a year, even though she had accumulated over a hundred sick days (Department policy prohibited employees from taking sick days exceeding the departmental leave average by more than twenty percent regardless of accumulated days). [DE 64-1 at 4]. In contrast, she says that Ray Lea, a male supervisor, took five or six days off in a year but was not

disciplined. [DE 53-1 at 36-37]. While Calderaro does not provide great detail as to how she and Lea were similarly situated, it does appear that they were both supervisors and engaged in comparable conduct (indeed, if anything Lea's conduct appears more egregious than Calderaro's). Calderaro received a Guardian entry but Lea did not. But Calderaro provides no evidence that Lea took his days off after the new leave policy was adopted in 2012. As such, there is an insufficient basis to conclude that Calderaro and Lea were "subject to the same standards" and thus there are no grounds to draw an inference of discriminatory treatment. *See Abuelyaman*, 667 F.3d at 810.

So, Calderaro has not established that she was treated materially worse than any similarly situated officer, which defeats any inference of discrimination. Further, even if she had, that still would not be enough to support an inference of discrimination under the direct method of proof. *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012) ("In sum, Good has presented evidence that three similarly situated, non-white co-workers received better treatment when they were permitted to take demotions from their managerial roles, yet Good, who is white, was terminated from her position as a supervisor. Under the direct method, however, we cannot conclude that Good's disparate treatment was racially motivated without evidence pointing more directly to a discriminatory motive without reliance on speculation.").

That leaves Calderaro's argument that Dowling authorized three internal investigations against women since 2012, but only one against a man. She considers this to be a statistical disparity that indicates the internal investigation against her was motivated by discriminatory animus. But the sample size Calderaro offers is far too small to allow for a reasonable inference of discrimination. *See Parker v. Fed. Nat. Mortgage Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984). She also fails to engage in any meaningful comparative analysis of the kind of conduct that led to

those investigations, further undercutting their probative value. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000); *see also DeLaney v. Chertoff*, No. CIV.A. 07 C 5785, 2008 WL 4773163, at *1 (N.D. Ill. Oct. 30, 2008).

Thus, Calderaro has not offered any evidence to link her proffered adverse employment actions to discriminatory animus. She attempts to provide a combination of purported pretext, stray discriminatory remarks, evidence that similarly situated males were treated more favorably than herself and statistics allegedly indicative of a gender disparity in internal investigations. But she fails to provide evidence that could support a reasonable finding of pretext and the allegedly discriminatory remarks she points to are both dated and ambiguous at best. Further, her examples of differential treatment either overlook material differences between her and her proffered comparators or identify differential treatment that is too slight to raise an inference of discrimination.[8] So, she is left with her statistical evidence, which is not probative due to its small sample size and lack of comparative analysis. As such, she has failed to present evidence of animus sufficient to bring a claim of direct discrimination to a jury.[9]

*Adverse Employment Action*

Even if Calderaro were able to produce evidence of discriminatory animus, several of her claims would fail for a different reason. To recover on a theory of direct discrimination, a plaintiff must establish that she suffered an adverse employment action. *Oest*, 240 F.3d at 611. Calderaro alleges that she suffered four consequences as a result of her purportedly

---

[8] Calderaro also appears to assert that it is suspicious that she was promoted sergeant after she filed this lawsuit, though does not develop that contention or provide any authority or evidence to support it. Based on the abbreviated argument she has presented, the Court is unable to discern any inference of animus from the Department's decision to promote Calderaro after she filed suit.

[9] In her briefing, Calderaro appears to tie each piece of evidence of discriminatory animus to a particular proffered adverse employment action. The Court has evaluated her arguments accordingly. It notes, however, that since none of her evidence is probative of prohibited animus, even if it were applicable as a whole to any one alleged adverse employment action, it would still be insufficient to survive summary judgment.

discriminatory treatment: the Guardian Tracking entries she received, the internal investigation she underwent, Dowling's failure to promote her to the rank of sergeant in June 2012 and Dowling's failure to appoint her to command in January 2012. The Court disagrees that the first three of these constitute adverse employment actions.

Calderaro first points to the Guardian Tracking entries she received. But those entries are merely informal notations in a personnel tracking database and there is no indication that Calderaro suffered any adverse consequences as a result of them. Further, it is well established that even negative formal performance evaluations, in and of themselves, even if unfounded, do not constitute adverse employment actions. *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996).

Further, while she notes that the Guardian Tracking entries caused her humiliation and resulted in other officers avoiding her, that does not suffice to make them adverse employment actions. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (holding that general workplace hostility does not qualify as an adverse employment action without a showing that it was severe and pervasive); *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006) (finding shunning by coworkers insufficient to constitute a materially adverse action). Calderaro also claims that her future career prospects could be harmed by her Guardian Tracking entries, since applicants' Guardian files are often examined when applying for federal jobs. But she cites to Smith's testimony, which says only that Guardian files could be used in hiring decisions or produced in background checks, not that it is common practice. [DE 53-4 at 5-6]. And at any rate, such "[h]ypothetical possibilities are not materially adverse employment actions." *Probst v. Ashcroft*, 25 F. App'x 469, 472 (7th Cir. 2001); *see also Patt v. Family Health Sys., Inc.,* 280 F.3d 749, 753 (7th Cir.2002) (no adverse employment action where an employer dropped hints about his

negative views of the plaintiff in a background check, and the plaintiff did not present any specific evidence showing how the defendant limited her career opportunities).[10]

Calderaro next asserts that the internal investigation against her, which ultimately exonerated her, constituted an adverse employment action. But like adverse performance evaluations, internal investigations are not, in and of themselves, adverse employment actions. *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) (placement of plaintiff on paid leave pending results of fitness-for-duty psychological examination did not constitute adverse employment action); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013) ("neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action.") (quoting *Dendinger v. Ohio*, 207 Fed.Appx. 521, 527 (6th Cir. 2006)). While Calderaro testified that the investigation caused her great stress, "not everything that makes an employee unhappy is an actionable adverse action." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir. 2001). Since Calderaro does not allege that she suffered any job-related consequences as a result of the internal investigation, her claim that it was an adverse employment action fails.

Calderaro also argues that Dowling's failure to promote her to sergeant in 2012 was an adverse employment action. The Defendants first contend that this is time barred and not encompassed by Calderaro's Equal Employment Opportunity Commission right to sue letter. The Court finds otherwise. Claims "about discrete employment actions, such as failure to promote, must be made within 300 days under Title VII." *Pruitt v. City of Chicago, Illinois*, 472

---

[10] Calderaro disagrees with this conclusion, citing to *Kielczynski v. LaGrange*, 122 F. Supp. 2d 932, 941 (N.D. Ill. 2000). But that case does not directly analyze whether the Plaintiff suffered an adverse employment action. And even if it did, as a district court case, it would not be sufficient to overcome clear Seventh Circuit precedent.

F.3d 925, 927 (7th Cir. 2006). Calderaro alleges that she was not promoted following a May and June 2012 sergeant's exam. Her charge of discrimination encompassing that conduct was filed on September 18, 2012, well within the 300 day limit. Moreover, that charge of discrimination adequately preserved her failure to promote argument. A plaintiff's allegations in a lawsuit need only be "like or reasonably related to" her allegations in an EEOC charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). Calderaro explicitly complained to the EEOC that "I remain as the number 1 ranked candidate but have not been awarded a promotion." [DE 47-7].

So, the Court turns to the merits of her argument. While a failure to promote is an adverse employment action, *Volovsek v. Wisconsin Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003), the "lack of an opening is always a legitimate reason for refusing to hire or promote." *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 673 (7th Cir. 2009). Here the uncontroverted evidence indicates that no individual was promoted to sergeant in 2012.

Nevertheless, Calderaro might be able to pursue her claim by presenting evidence that the Department chose to close an open position or not to create a position out of discriminatory animus. *See id*. ("In rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was" motivated by discriminatory animus.). She does not present such evidence. While she cites the retirement of Sergeant Brian Vandenburgh in 2009, she fails to explain how that would have resulted in an open position when she sat for a sergeant's exam nearly three years later. Moreover, Dowling testified that the Department never intended to fill Vandenburgh's position due to financial considerations. He further testified that the Department administered a sergeant's exam in 2012 so as to have viable candidates identified in case an opening for that rank arose. At that time, fifteen individuals were eligible for retirement and Dowling expected that an additional retirement could give rise to

a sergeant's opening. [DE 47-2]. And while Calderaro points to the Department's administration of the 2012 sergeant's exam as evidence that an opening existed, she does not refute Smith's testimony that the Department offered promotional exams when it had either current *or anticipated* vacancies. [DE 47-3 at 4]. So, no reasonable juror could conclude that the Department chose to close or otherwise not create a sergeant's position in response to Calderaro's interest.

That leaves Calderaro's claim that Dowling failed to appoint her to Commander. The Defendants do not appear to contest that this constitutes an adverse employment action, and the Court agrees. Materially adverse employment actions traditionally include significant reductions in wages or salary, losses of benefits and alterations of job responsibilities. *Oest*, 240 F.3d at 612-13. In this case, Calderaro suffered a $6,000 reduction in salary when she was reassigned from command. [DE 53-1 at 17]. Further, she testified that Commanders had overall responsibility for their respective units, which she would not have had when she was transferred to the patrol division. [DE 53-1 at 13]. As such, Calderaro would have suffered an adverse employment action when Dowling appointed Vode to command staff. But again, as previously discussed, she has failed to establish that any such adverse employment action was the result of discriminatory animus.

So, Calderaro has attempted to bring claims based on three types of purported direct discrimination: (1) Dowling's decision to appoint Vode instead of her as Commander in January 2012, (2) Dowling's decision not to promote her to sergeant in June 2012 and (3) the Guardian Tracking entries she received and internal investigation she experienced. But, as previously discussed, she has failed to present evidence connecting any of these to discriminatory animus. Further, she has not raised a triable issue regarding whether she suffered an adverse employment

action as to the latter two.  Consequently, she has not raised a genuine issue of material fact as to any of her proffered means of establishing a direct discrimination claim, and summary judgment is appropriate.  *See Coleman*, 667 F.3d at 845.

4.  Indirect Discrimination

Calderaro also seeks to make out a claim under an indirect method of proof.  This requires her to show that: (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) her employer treated similarly situated male employees more favorably.  *Id*.  If she can meet these requirements, the burden shifts to the Defendants to articulate a legitimate non-discriminatory reason for their actions. *Id*.  The plaintiff then must demonstrate that the Defendants' proffered reasons are pretext. *Id*.

Calderaro says that Vode was similarly situated to her, yet was treated more favorably when he was selected to assume Calderaro's command position in 2012.  The Defendants do not appear to contest that the Calderaro is a member of a protected class, that she met the Department's legitimate expectations and that her failure to be appointed to the command position constituted an adverse employment action.  Thus, the parties' dispute whether Calderaro can make out a claim of discrimination via an indirect method of proof turns on whether Calderaro can establish that Vode was similarly situated to her and whether she can demonstrate that Dowling's justification for selecting Vode over her was pretextual.

Calderaro's argument that she and Vode were similarly situated is markedly underdeveloped.  She alleges only that she had the same boss as Vode, performed the same job and was subject to the same selection criteria.  She does not address how she had the same "performance, qualifications and conduct", which would seem pivotal to assessing whether the

two were similarly situated for the purposes of an appointment to command. *See Harris v. Firstar Bank Milwaukee, N.A.*, 97 F. App'x 662, 664 (7th Cir. 2004). In her direct method of proof argument, she does point to the 2012 sergeant's test results for the proposition that she is a superior leader to Vode. But it is difficult to discern how test results from May and June 2012 can establish how Calderaro was similarly situated to Vode in January 2012. Furthermore, those test results do not account for other possible variables such as Vode's military experience, Dowling's desire to give previously overlooked officers an opportunity to serve in command or Calderaro's and Vode's performance in interviews for the Commander position.

But even presuming that Vode and Calderaro were similarly situated, Calderaro's claim falters. As discussed above, Dowling said that he offered the command position to Vode over Calderaro because he thought Vode had a superior capacity for leadership, in part given his military experience. That is a legitimate, nondiscriminatory reason for selecting Vode over Calderaro, which switches the onus to Calderaro to show pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996) (the Defendants' burden of producing evidence of a legitimate, non-discriminatory reason is merely a burden of production that is "not difficult to satisfy").

Consistent with the above analysis, she is unable to do so. At best, she has established that a factfinder could find her to be qualified for command. She has not provided evidence that "there can be no dispute among reasonable persons of impartial judgment that the [she] was clearly better qualified for the position" than Vode. *Millbrook*, 280 F.3d at 1180. Further, the Court notes that removal of all command staff was normal practice for new police chiefs in the Department. [DE 53 at 6]. While that does not itself preclude a finding of pretext, it does tend to undercut the assertion that there was anything suspicious about Dowling's decision to remove

Calderaro and replace her with Vode. In light of Calderaro's inability to demonstrate a triable issue as to pretext, summary judgment is appropriate. *See id.* at 1184.[11]

### 5. Retaliation

Finally, Calderaro alleges Title VII retaliation via both direct and indirect methods of proof.[12] "Regardless of which method the plaintiff employs to show retaliation, [she] must first demonstrate that [she] engaged in activity that is protected by the statute. Specifically, [she] must show that [she] took some step in opposition to a form of discrimination that the statute prohibits. The plaintiff need not show that the practice [she] opposed was in fact a violation of the statute; [she] may be mistaken in that regard and still claim the protection of the statute." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). Her opposition, however, must be based on a good-faith and reasonable belief that she is opposing unlawful conduct. *Id.*

Calderaro indicates that her retaliation claims result from her reporting to her superior that a picture resembling an erect penis, alcohol, a minority woman, and an alien was displayed on Defendant Vode's door and interior window. [DE 52 at 40]. After seeing these pictures, she wrote a letter to Sergeant Mysliwiec indicating that she had "never seen anything so shocking,

---

[11] Calderaro also appears to argue that she can satisfy the indirect method of proof based on her failure to receive a promotion to sergeant in 2012. But while that attaches an indirect method of proof label to her argument, it essentially reiterates the same direct discrimination claim addressed above. *See* [DE 52 at 28] (To prevail on her indirect discrimination claim "Calderaro must demonstrate that she is part of a protected class; applied for a promotion; and was not given the promotion because of her gender."). To the extent Calderaro conceives of this as a separate claim, it fails. A failure to promote claim under an indirect method of proof requires evidence that an individual outside of the protected class who was not better qualified than the plaintiff received a promotion, or that an employer declined to fill a position because of discriminatory animus and sought to have that position's work performed in other ways. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1118 (7th Cir. 1992). Calderaro has presented no such evidence.

[12] Calderaro argues that her retaliation claims must proceed to trial because the Defendants "failed to raise any argument regarding Title VII retaliation" in their motion for summary judgment. [DE 52 at 43]. But that motion explicitly argued that "Plaintiff fails to put forth evidence to establish a *prima facie* case of sex and/or retaliation discrimination as to any of her allegations" and seeks summary judgment on *all claims*. [DE 46 at 3-4].

disturbing or offense to women[.]"  [DE 53-19].  Calderaro contends that this letter constituted a report of harassment, or at least what she believed in good faith to constitute harassment, such that it constitutes protected activity.

This Court finds otherwise.  Harassment must be severe and pervasive to fall within the purview of Title VII.  *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005).  So while display of the picture was undeniably inappropriate and unprofessional, isolated incidents of salacious or offensive conduct generally do not give rise to a reasonable perception of harassment and complaints as to them are typically not protected activity.  *See, e.g.*, *O'Leary*, 657 F.3d at 631 (complaint as to a single instance of imprudent, though relatively tame, sexually-charged remarks not protected conduct); *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (complaint regarding brief exchange over a sexual remark in a job applicant's psychological evaluation not protected activity).  A complaint as to off-color pictures, without more, falls into this category.  *Baker v. Pro Floor, Inc.*, No. 04-C-0157-C, 2005 WL 79010, at *4-5 (W.D. Wis. Jan. 6, 2005) (complaint regarding picture of man feigning sex with a sheep not protected activity).  Thus, Calderaro did not engage in protected activity when she reported the pictures on Vode's door, which precludes her retaliation claim.

Finally, even if Calderaro had engaged in protected activity, under either a direct or an indirect method of proof she would have to show that she suffered a materially adverse action.  *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).  She has failed to do so.  She alleges that the Guardian Tracking entries she received, the internal investigation to which she was subjected, a statement by Lieutenant Decrescenzo that officers should "watch out for Peggi Calderaro", [DE 53-40], the Department's failure to promote her to sergeant in 2012 and her removal from a women's self-defense course constitute materially adverse actions.

The Court respectfully disagrees. For reasons outlined above, the Guardian Tracking entries, general workplace antipathy and the internal investigation do not constitute materially adverse actions. [13] Moreover, Calderaro has not presented evidence that the Department closed an open position or otherwise failed to promote her in 2012. So, that leaves Calderaro's claim that she was removed as the instructor of the Department's women's self-defense class. But Calderaro provides no evidence that she suffered a cut in pay, benefits or privileges of employment as a result of her reassignment from the women's self-defense class. And her personal preference to teach that class is not itself sufficient to make her removal from it an adverse employment action. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009). [14] Accordingly, Calderaro has failed to present evidence that would permit a reasonable juror to conclude that she engaged in protected activity or suffered an adverse employment action. As such, summary judgment is appropriate on her retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to strike [DE 59] is DENIED and all Defendants other than the Town of Schererville are DISMISSED with prejudice. The Court

---

[13] While the Court acknowledges that a materially adverse *employment* action for purposes of a discrimination claim is not completely coextensive with a materially adverse action for purposes of a retaliation claim, that distinction does not alter the analysis here. *See, e.g., Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703-04 (7th Cir. 2012) (applying the traditional adverse employment action inquiry as a method of evaluating the materiality of an alleged materially adverse action that occurred at work).

[14] Calderaro also claims that she suffered two other materially adverse actions for which she fails to provide adequate supporting evidence. First, she contends that she suffered a materially adverse action when the Department "informed the public that Calderaro was not qualified to teach" the women's self-defense class. [DE 52 at 41]. But she cites to the following exchange on the Schererville Crime Watch Facebook page, which says no such thing: Paulette Young: "I love Peggys class, I remember being in it yrs ago when she first started it" Schererville Crime Watch: "Paulette, this class will be instructed by actual Physical Tactics Instructors that are certified through the Indiana Law Enforcement Academy. We encourage you to take the class again to keep your skills and awareness up to date." [DE 53-30 at 3]. Calderaro also points to a letter regarding a change in fire response policy that Neyhart sent to patrol supervisors. She claims that this change in policy "all but specifically identifie[d] Calderaro, thus . . . publishing [her] discipline." [DE 53 at 26]. But the letter appears to have been disseminated to convey the importance of "the need to better communicate with each other at emergency scenes" rather than to disparage Calderaro. [DE 53-28 at 2]. Indeed, nowhere does it mention Calderaro or reprimand, disparage or discipline any officer, anonymously or otherwise.

further GRANTS the Defendants' motion for summary judgment [DE 46] and DIRECTS the

court to enter judgment for the Town of Schererville.

SO ORDERED.

ENTERED:  March 31, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court